CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

AUG 1 6 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# United States District Court
## Western District of Virginia
### Harrisonburg Division

|  |  |
|---|---|
| DONNA MEADOWS, | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| *Defendant* | ) ) ) |

Civil No.: 5:11cv00063

REPORT AND
RECOMENDATION

By: Hon. James G. Welsh
U. S. Magistrate Judge

 

Donna Meadows brings this civil action challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her applications for a period of disability and disability insurance benefits ("DIB")[1] under Title II and for Supplemental Security Income ("SSI") [2] under Title XVI of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416 and 423and 42 U.S.C. §§ 1381 *et seq.*, respectively. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

---

[1] The plaintiff's insured status for DIB expired September 30, 2011. (R.17).

[2] The plaintiff's period of eligibility for SSI extends through the date of the ALJ's December 14, 2010 decision.

The record shows that the plaintiff originally filed her claim for DIB on March 31, 2008 and her claim for SSI on August 28, 2011. (R.15). In each she alleged that she became disabled as of March 31, 2009 due to a major depressive disorder, fibromyalgia, leucopenia and chronic fatigue syndrome. (R165-166,173-181). Both claims were denied initially, on reconsideration, and for a third time by written decision issued December 14, 2010 following an administrative hearing before an administrative law judge ("ALJ"). (R.15-31,32-64,65-71,78-93).After unsuccessfully seeking Appeals Council review (R.1-8), the unfavorable ALJ decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

Along with his Answer to the plaintiff's Complaint, the Commissioner has filed a certified copy of the Administrative Record ("R."), which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Both parties have since moved for summary judgment, and each has filed a supporting memorandum of points and authorities. No request was made for argument.

## I.       Summary and Recommendation

On appeal the plaintiff contends that the ALJ's non-disability determination was erroneously based on multiple decisional errors, including a failure to give the required deference and consideration to various source opinions, a failure to give the requisite decisional weight to

2

several treating source opinions concerning the severity of the plaintiff's medical and mental health impairments, an improper evaluations of the listings,[3] a failure to make an assessment of her capacity to engage in work activities on a "function-by-function" basis, and an erroneous assessment of her credibility. For the reasons that follow, each of these arguments is without merit, and it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, the Commissioner's motion for summary judgment be **GRANTED**, the plaintiff's motion for summary judgment be **DENIED**, and this cause **STRICKEN** from the docket of the court.

## II.     Standard of Review

The court's review in this case is limited to determining whether the factual findings of the Commissioner are supported by substantial evidence and whether they were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2$^d$ 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."*Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990) (quoting

---

[3]   The Listing of Impairments ("the listings") is in appendix 1 of subpart P of part 404 of 20 C.F.R. It describes for each of the major body systems impairments that the agency considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

*Laws*, 368 F.2$^d$ at 642). The court is "not at liberty to re-weigh the evidence . . . or substitute [its] judgment for that of the [ALJ}." *Johnson v. Barnhart*, 434 F.3$^d$ 650, 653 (4th Cir. 2005) (internal quotation marks omitted).

### III.    Evidence Summary

#### Work History and Vocational Profile

At the time the plaintiff alleges that her disability began, she was forty-two years of age.[4](R.15,30,39,173). Her education included high school, three years of hours of college, and certification as a special events manager. (R.39,201). Her past relevant work was included jobs as a dispatcher, bank teller, and banquet manager (events coordinator). (R.58,196-197,209-210). Work as a dispatcher was classified by the vocational witness to be semi-skilled and exertionally sedentary; work as a bank teller was classified as semi-skilled and exertionally light, and her job as an events coordinator was classified as skilled and exertionally light, as generally performed. (R.57-58).

#### Daily Activities

---

[4]  At this age the plaintiff is classified as a "*younger person*," and pursuant to the agency's regulations age is generally considered not to affect seriously a younger person's ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.920(c).

4

According to the plaintiff and her husband, her range of daily activities include self-care, cooking, cleaning, driving, shopping, handling changes in routine, and interacting with family and friends. (R.47-49,50,218,220-222,224,231-233,261-265). She reports a continuing ability to lift ten pounds, carry several bags of groceries and an ability to do some mowing, but no ability to do ironing due to its "repetitiousness" (R.47-49,54,223). Additionally she reports the regular use of Aleve and "relaxation techniques" to relived pain, and she has found that sitting and resting for one-half an hour will relieve her pain. (R.45,216-217).

## Medical History

Prior to the plaintiff's alleged March 2008 disability onset date, the records of Samuel Hostetter, M.D., her primary care physician, show a medical history that included treatment for depression, leukopenia, possible fibromyalgia, and low energy. (R.497,503,514,521-525,529). By history these records also show that she was being professionally treated for her depression through Comprehensive Behavioral Health ("CBH") with counseling and a medication regime that generally included her use of either Adderall and Lorazepam or Clonazepam and Ritalin. (R.519,525). Based on the plaintiff's expressed lack of a good working relationship with the counselor at CBH, Dr. Hostetter referred the plaintiff to Christine McDowell, Ph.D., at Psychiatric Associates of the Shenandoah. (R.395-397,512,514,517,546). When seen by Dr. McDowell on April 23, 2008 the plaintiff reported experiencing lethargy, feelings of hopelessness and helplessness, loss of pleasure, fatigue, a diminished ability to think, and problems sleeping.

5

(R.395-397). Her mental health condition was diagnosed to be a major depressive disorder, and Dr. McDowell's records show that over the ensuing seven months the plaintiff continued to report the same difficulties. (R.381-394).

Following an initial psychiatric evaluation on April 28, 2008at Augusta Psychological Associates, E. P. Burdick, M.D., similarly concluded that the plaintiff was suffering from a major depressive disorder. (R.373-379). To control her symptoms, Dr. Burdick similarly prescribed an anti-depressant regime, and he estimated that she should be able to return to work by mid-June 2008. (R.372). Although she reported experiencing panic attacks in October 2008, Dr. Burdick's office notes variously dated between June 2008 and October 2009 suggest no significant change in her mental status during that period of time. (R.347-349,352-372,464-488,595-613).

Also in April 2008 and also on Dr. Hostetter's referral, the plaintiff was seen by Daniel G. El-Bogdadi, M.D., at Augusta Rheumatology and Osteoporosis with complaints of joint pain and "fibromyalgia," [5] (R.405-409). On examination and relevant to his diagnosis of fibromyalgia, Dr. El-Bogdadi found the plaintiff to exhibit some restriction in her back flexion and extension; he found trigger point tenderness at all eighteen fibromyalgia diagnostic sites, and he noted that his fibromyalgia diagnosis was "really along the same spectrum" as depression and chronic fatigue. (R.406,409). As part of his examination, he noted that he found the plaintiff to be well-appearing, in no acute distress, to exhibit full strength in all extremities, a normal gait, and exhibit no neurological deficits. In addition to the diagnostically relevant tender points, Dr. El-Bogdadi

---

[5] The plaintiff reported that she had been diagnosed with this condition by someone in the waiting room. (R.405).

made note of the fact that the plaintiff also reported "many nonspecific tender points as well."[6](*Id.*). On the basis of laboratory results showing her level of vitamin D and her white blood count to be abnormally low, he also diagnosed her as being mildly anemic. (*Id.*). Based on these findings, Dr. El-Bogdadi recommended a treatment plan that included aquatic physical therapy, a twelve-week high dose vitamin D regime, basic blood work to rule-out any autoimmune disease, and a follow-up appointment in one month. (*Id.*).

On follow-up, Dr. El-Bogdadi saw the plaintiff six additional times between June 2008 and January 2009. (R.399-404,432,682). To rule-out any muscle or nerve abnormality, in June 2009 Dr. El-Bogdadi referred the plaintiff for an electrodiagnostic study. [7](R418-419). Given her low white blood count ("leucopenia"), in June as part of his consultive follow-up Dr. El-Bogdadialso referred the plaintiff to Todd Wolf, M.D., at the Augusta Health Cancer Center. (R.335-336). Throughout the remainder of 2008 and in January 2009, Dr. El-Bogdadi found the plaintiff's social and family history to remain unchanged; she continued to be well-appearing, to walk normally and to exhibit no acute medical problem. (R.399-404,682). In September she reported "just a little discomfort," and in November and in January Dr. El-Bogdadi's physical examinations demonstrated only minimal tender points. (R.399-400,682). Likewise, when he next saw her more than one year later in July and September 2010, his office notes indicate that her condition remained stable and essentially unchanged. (R.762-763)

---

[6]  In addition to her report to Dr. El-Bogdadi of multiple nonspecific tender points, in January 2009 she made similar reports of abdominal, bilateral hand, bilateral thigh, calf and ankle, and jaw pain to the physical therapist. (R.695-696).

[7]  The results were "borderline normal" and suggested no acute muscle or nerve condition. (R.418-419).

7

Between April 2008 and July 2010 the plaintiff also sought treatment through the emergency room at Augusta Health on several widely separated occasions. No serious medical or psychiatric condition was noted by the emergency room physician on any of these six instances. (R.549-550,557-560,563-574,628-635,770-784).

When first seen in July 2008by Dr. Todd Wolf, his notes similarly record the plaintiff's diffuse, nonspecific pain complaints. (R.335). They show that she reported no episodes of infection, fevers, chills, or bone pain which might suggest a medically significant condition related to her leucopenia. (*Id.*). Likewise, they document Dr. Wolf's conclusion that "[he] did not think [this condition would] be of great significance . . . in the future."(R.335-336). Follow-up iron profile, liver function, and foliate deficiency studies were all normal. (R.333-334,336,582-583,687-688). She did, however, exhibit a B12 deficiency, and she was started on a monthly injection regime. (R.333-334,538,544,555-556,561-562,565-566,576-593,686-689). When last seen by Dr. Wolf in September 2010, the plaintiff's B12 and folic acid levels were normal; she elected to continue monthly B12 injections through the clinic. (R735-739). In assessing the plaintiff's condition Dr. Wolf concluded that no further work-up was medically indicated and reaffirmed his belief that the plaintiff's leucopenia continued to be of no clinical significance. (R.735-736).

Dr. Hostetter's office records, dated in 2009 and 2010, show that the plaintiff continued to report that she was depressed, in chronic pain, exhausted, unable to sleep, having memory problems, and having difficulties with inter-personal relationships. (R.495-504,506-510,519,538-

8

539,691-692). These records also show that in 2009 the plaintiff once again had to arrange for a new mental health professional.[8] *Inter alia*, throughout this period they also record Dr. Hostetter's continuing opinion that the plaintiff was unable to work due to her depression and an attendant inability to handle stress. (R.497,502.505,507,521).

Consistent with the several diagnoses of depression and associated issues noted by mental health professionals in 2008 and 2009, when the plaintiff first saw Michael Hoffman, M.D., in February 2010, he found that she "needed help for a number of different problems mostly related to depression . . . and [various] physical problems." (R.702-704). His diagnoses at that time included depression, panic disorder, post traumatic stress disorder, and attention deficit disorder. (*Id.*). As part of Dr. Hoffman's initial evaluation, the plaintiff reported that medications had "worked well" for her, but she had stopped using them the previous November. (R.702). Her explanation was that she thought she had been using too many medications, but she now knew that this was a mistake. (*Id.*). On examination, Dr. Hoffman found the plaintiff to be fully oriented, to exhibit organized and logical thought processes, to have an intact memory, to exhibit appropriate affect, insight and judgment, and to be cooperative with the interview process. (R.703). When she saw Dr. Hoffman for monthly medication checks over the ensuing seven months, Dr. Hoffman noted that on some occasions she appeared to be doing better and at other times to be doing less

---

[8]On January 22, 2009 the plaintiff was seen for an initial mental status evaluation by a social worker at Augusta Health's Behavioral Health Services. (R.714). There is nothing in the administrative record to suggest that she undertook any follow-up until she saw the social worker for an initial series group therapy sessions in November 2009(R.664-679,718), for a second series of group sessions during the early months of 2010 (R.706-717), and for a third time in July. (R.741-760).In late January 2009 the plaintiff was also separately seen for an initial mental status evaluation at Augusta Psychological Associates; however, she did not thereafter attend any type of follow-up. (R.459-463).

well. (R.684,700-701,727-732,799-800). During this period of psychotropic treatment, Dr. Hoffman's office notes and an Augusta Health discharge summary dated December 9, 2009 documenting the plaintiff's hospitalization for treatment an alcohol and medication overdose "in order to get some sleep" (R.783) suggest that the plaintiff experienced only a single period of any significant deterioration (decompensation) of her psychiatric illness.

## Opinion Evidence

Based on their reviews of the plaintiff's treatment record, including her range of daily activities, two state agency medical reviewers separately concluded that the plaintiff retained the functional capacity to perform work activity at a light exertional level. (R.433-439,279-285,294-300). Likewise, on review two state agency psychologists separately concluded that the plaintiff's mental health issues (depression, anxiety, and mental attention deficit disorder) were non-disabling. Given the absence of any repeated episodes of decompensation of extended duration, given the mild impact of her mental health issues on her daily living activities and on her social functioning, given her moderate difficulties maintaining concentration, persistence and pace, both psychologists concluded that the plaintiff retained the ability to perform simple, routine tasks in a work environment. (R.440-457,280-282,294-297).

In contrast, Dr. El-Bogdadi opined in his questionnaire responses that the plaintiff's multiple medical problems, (chronic fatigue, fibromyalgia, weakness, memory loss and depression, along with exacerbated pain related to weather changes) made her incapable of even a low stress job. (R.680,721-725). Similarly, in his response to a mental impairment questionnaire Dr. Hoffman opined that the plaintiff's limited response to mental health treatment in combination with what he described as her "disable[ing] medical problems ("fibromyalgia, chronic fatigue, PTSD, and leucopenia") made it "not likely" that she would be able to return to work. (R.793-798). Although he opined that the plaintiff's mental health issues no more than moderately impacted her functional abilities, in assessing the plaintiff work ability Dr. Hoffman further opined that the plaintiff had experienced four or more episodes decompensation within the preceding year, that each had been of at least two weeks duration, and that she would be unable to work four or more days each month. (R.793-798).

As the plaintiff points-out in her brief, the record also contains the professional opinions of Drs. Burdick and Hostetter. (No. 11, pp. 12-13) During the period between April 2008 and October 2009, the plaintiff saw Dr. Burdick on a more-or-less monthly basis for treatment of her mental health issues, and in a partially illegible handwritten on August 14, 2008Dr. Burdick noted that the plaintiff has stopped working and would be "unable to work" for some period. (R.357). Separately, during a period when Dr. Hostetter was seeing the plaintiff quarterly for primary health care and after he had referred the plaintiff to others for treatment of her fibromyalgia pain and mental health issues, in a one-page insurance company form dated March 19, 2009 Dr.

11

Hostetter reported that due to the plaintiff's "mental health difficulty with interpersonal relationships" she unable to function in a work setting. (R.502).

Additional opinion evidence in the record includes vocational testimony at the administrative hearing. (R.58-63). In response to the ALJ's hypothetical question, the vocational witness testified that an individual with the plaintiff's vocational profile, with the ability to perform physical activity at a light exertional level, [9]and with certain emotional limitations (including a moderately limited ability to understand, remember and carry-out detailed instructions, a moderately limited ability to maintain attention, concentration, consistent pace and completion of a workday without psychologically based interruptions) could perform a range of unskilled light work. (R.30-31,58-60,293-297). As representative examples of such work, the vocational witness listed laundry sorter, stock checker, and cleaner. (R.30-31,61-63).

## IV.  Discussion

### A.

Central to the plaintiff's claim that the ALJ's adverse decision is not supported by substantial evidence is her argument that the ALJ erred by failing to give either significant or controlling decisional weight to the treating source opinions of Drs. Hoffman and El-Bogdadi and

---

[9]"*Light work* involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. 404.1567(b) and 416.967(b); *see also* R.294-295.

by failing to consider the treating source opinions of Drs. Burdick and Hostetter. (No. 11, pp.7-13). The commissioner, on the other hand, argues that the ALJ properly assessed the opinions of the treating physicians in accordance with the agency's regulations.

Sections 404.1527(d) and 416.927(d) of 20 C.F.R. require the ALJ to give a treating physician's opinion controlling weight only when two conditions are met. First, it must be well-supported by medically acceptable clinical and laboratory diagnostic techniques; and second, it must not be inconsistent with the other substantial evidence in the record. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

Following this decisional analysis, the ALJ found that the opinions of Drs. McDowell, El-Bogdadi and Hoffman should be given "minimal weight." (R.29). Each, he concluded, was not well-supported because it "rel[ied] heavily on the subjective report of symptoms and limitations provided by the [plaintiff," which were not supported by the totality of the evidence. In accordance with the second analytical step, the ALJ then concluded that each of these treating source opinions was "[in]consistent with the medical evidence of record." (*Id.*).

On review, the record fails to reflect any physical or mental impairment that is necessarily of disabling severity. *Denton v. Astrue*,596 F.3d 419, 426 (7th Cir. 2010)(A diagnosis of fibromyalgia does "not necessarily equate with a decision of 'disabled.'");*Bartyzel v. Commissioner of Social Security*, 74 Fed. Appx. 515, 527 (6th Cir. 2003)(fibromyalgia "does not automatically qualify as a listing level impairment");*Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.

13

1986) ("[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss").

Moreover, the record amply demonstrates that the ALJ's determination to afford limited weight to the opinions of Drs. El-Bogdadi and Hoffman is supported by substantial evidence. *Inter alia*, in combination the plaintiff's medical history of conservative treatment both for her medical and mental health issues, her various inconsistent statements, the scope of her daily activities and on her less-than-total medication compliance, more than adequately support the ALJ's finding that the plaintiff's subjective complaints and alleged limitations were not fully persuasive. (R.18,28-29).

The ALJ's decision shows that he took note of the fact that fibromyalgia and chronic fatigue conditions could "increase the severity of co-existing or related impairments" (R.27); however, his decision also took into consideration the fact that the plaintiff was well-appearing, in no acute distress, exhibited full strength in all extremities, had a normal gait, no neurological deficits, was fully oriented, exhibited organized and logical thought processes and had medical and mental health condition that were treatable pharmacologically with generally good effect. (R.18-25; *see e.g.,* R.399-404,406,409,682,703,799-800). His detailed summary of the plaintiff's medical records also demonstrates that trigger-point tenderness was the only decisionally significant medical abnormality found on physical examination and that she generally exhibited normal mental status signs except for depression and anxiety. (R.18-25; *see* R.406,409). Additionally, the ALJ's summary of the medical record documents the absence of any medically

14

required hospitalization, a single mental health-related hospitalization due to a medication overdose, and the absence of any functional capacity assessment by any treating source. (R.18-35; *see also* R.783).

Based on this conflicting clinical evidence and an attendant lack of corroboration, the ALJ's had the requisite discretion to accord only "minimal" decisional weight to the opinion of Dr. El-Bogdadi and similarly to the opinion of Dr. Hoffman, irrespective of their status as treating physicians. *See Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on . . . the ALJ.") (internal quotation marks omitted).

Moreover, to the extent Drs. El-Bogdadi's and Hoffman's statements regarding the limitations imposed by the plaintiff's fibromyalgic and psychogenic conditions may be construed as opinions speaking to the issue of whether the plaintiff is disabled for purposes of employment, such statements speak to the ultimate issue of disability, which is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(3)-(4) and (e) and § 416.927 (d)(3)-(4) and (e).

The opinions of Drs. Hostetter and Burdick, upon which the plaintiff also seeks to rely, are similarly not entitled to any special weight or significant on the basis of their source. In a file note dated August 14, 2008 Dt. Burdick opined that the plaintiff would be "unable to work" for the foreseeable future (R.357), and in a March 11, 2009 response to an insurance company inquiry Dr. Hostetter opined that the plaintiff is "not able to function in a normal work setting" (R.502). Both are conclusory opinions that are entitled to no deference because they invade the province of the

15

Commissioner to make the ultimate disability determination.20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1); SSR 96-5p.; *see Krogmeier v. Barnhart*, 294 F.3<sup>rd</sup>1019, 1023 (8<sup>th</sup>Cir. 2002) (statements that a claimant could not be gainfully employed are not medical opinions, but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner).

**B.**

Claiming generally that a review of the entire record demonstrates fibromyalgic and psychogenic conditions of listing level severity, the plaintiff next argues that the ALJ's contrary finding was based on a failure to adopt the various treating source opinions concerning her functional limitations. (No. 11, pp. 13-15). To the extent this contention is not a reassertion of the argument rejected in the preceding section herein above, it is nothing more than a general argument that the ALJ failed to analyze properly the plaintiff's impairments under the listings.

At step three of the agency's sequential analysis, [10]the ALJ must consider whether an individual's impairments, either individually or in combination, meets or equal an impairment

---

[10]This sequential process requires the ALJ to consider whether a claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and (5) if not, whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520 and 416.920. If the ALJ finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). Under this analysis, a claimant has the initial burden of showing that he or she is unable to return to any past relevant work because of his or her impairments. Once the claimant establishes such a prima facie case of disability, the burden shifts to the agency to then establish that the claimant has the residual functional capacity, considering the his or her age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2<sup>d</sup>866, 868-869 (4<sup>th</sup>Cir. 1983); *Hall v. Harris*, 658 F.2<sup>d</sup>260, 264-265 (4<sup>th</sup>Cir. 1981); *Wilson v. Califano*, 617 F.2<sup>d</sup>1050, 1053 (4<sup>th</sup>Cir. 1980).

16

enumerated in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Here, the ALJ reasonably determined that plaintiff's chronic fatigue, fibromyalgia, leukopenia, depression and anxiety were all *severe* impairments, but neither singularly nor in combination did they meet or equal a listed impairment. (R.17-27). Thus, contrary to the plaintiff's claim the ALJ did not err in his analysis of the listings and his determination that the plaintiff's condition was not of listing-level severity.

This argument's lack of merit is also apparent from the plaintiff's failure to provide any clinical or diagnostic evidence to demonstrate that her fibromyalgic or psychogenic conditions met or equaled any listing.[11] This lack of merit is equally evident from the absence of any reference in her brief to any specific listing she believes her condition meets or equals.

## C.

In her brief the plaintiff next claims that the ALJ failed to perform a proper function-by-function assessment of her ability to perform the physical and mental demands of work, in several respects. As support of this contention, she argues the ALJ's narrative failed to include a specific individual assessment of the functional impact of her poor posture, her unequal hip joint flexibility, her less than full thoracic spine range-of-motion, and her "spasms, fatigue and trigger points." (No 11, p. 16). Although the plaintiff correct in arguing that a function-by-function analysis is decisionally required, SSR 96-8p does not require an ALJ to produce such a detailed

---

[11]   The burden is on the plaintiff to present evidence in support of any allegation of disability at step-three of the sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

statement in writing. *Davis v. Astrue*, 2010 U.S. Dist. LEXIS 132972, *5 (DMd. Dec. 16, 2010). Rather, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p at *7; *Davis v. Astrue* 2010 U.S. Dist. LEXIS at *15-16; *see also Fleming v. Barnhart*, 284 F. Supp. 2$^d$256, 271 (DMd. 2003).

The ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and [he must] describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."SSR96-8p at *7; *Davis v. Astrue* 2010 U.S. Dist. LEXIS at *16; *see also Taylor v. Astrue*, 2012 U.S. Dist. LEXIS 11307, at *6 (DMd. 2012) (explaining that an RFC assessment is sufficient if it includes "a narrative discussion of [the] claimant's symptoms and medical source opinions."); *Banks v. Astrue,* 537 F. Supp. 2$^d$75, 84-85 (DDC. 2008) (after weighing several conflicting cases on the residual functional capacity narrative requirement, it was concluded that an ALJ needs only to explain an "individual's ability to perform sustained work activities in an ordinary work setting on a regular basis [and] describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record"); *Lewis v. Astrue*, 518 F. Supp. 2$^d$1031 (NDIll. 2007) (finding that SSR 96-8p does not create a function-by-function articulation requirement but instead only requires the ALJ to "consider, not articulate" an individual's residual functional capacity on a function-by-function basis).

18

In the case now before the court, the ALJ examined the entire record, including the opinion evidence. (R.17-30). He then assessed the opinion evidence, including the opinions of the state agency physician and psychologist and those of Drs. McDowell, El-Bogdadi and Hoffman. (R.29-30). Then, based on his assessment, the ALJ concluded that the opinions of the non-examining state agency consultants concerning the plaintiff's residual functional capacity were supported with "specific" reasons, "grounded in the evidence in the case record," and entitled to be assigned "great" decisional weight. (R.29). In contrast, he assigned "minimal" decisional weight to the treating source opinions of Drs. McDowell, El-Bogdadi and Hoffman on the basis of their "heavy" reliance on the plaintiff's subjective complaints and her reported limitations, their inconsistency with the record as a whole, and their lack objective evidentiary support. (*Id.*). In sum, the plaintiff's residual functional capacity was appropriately assessed by the ALJ, and the plaintiff's claim that the ALJ failed to make that assessment in accordance with SSR 96-8p is without merit.

### D.

The plaintiff also attacks the ALJ's assessment of the plaintiff's credibility. It is her contention that the ALJ erroneously based his discount of her credibility on what she describes as "several misstatements of the record."(No1, p 19).

In addressing this issue, it must be noted at the outset that the Fourth Circuit requires a reviewing court to give great deference to an ALJ's credibility determinations and assess them only as to whether they are supported by substantial evidence. *Eldeco, Inc. v. NLRB*,132 F.3[d]

1007, 1011 (4th Cir. 1997). Thus, an ALJ's credibility determination "should be accepted by the reviewing court absent exceptional circumstances." *Id.* (quoting *NLRB v. Air Products & Chemicals, Inc.*, 717 F.2$^d$ 141, 145 (4th Cir. 1983); *see also Bieber v. Dep't. of the Army*, 287 F.3$^d$ 1358, 1364 (Fed. Cir. 2002) ("credibility determinations of an ALJ are virtually unreviewable on appeal"); *Pope v. U.S. Postal Service*, 114 F.3$^d$ 1144, 1149 (Fed. Cir. 1997) (reviewing courts "are not in a position to re-evaluate . . . credibility determinations, which are not inherently improbable or discredited by undisputed fact"). Giving this required deference to credibility findings, it is obvious from the decision as a whole that the ALJ's credibility assessment is neither unreasonable nor contradicted by other findings made by the ALJ.

Moreover, the ALJ's determination that the plaintiff's subjective complaints were not fully credible is consistent with the two-step process required by the agency's regulations for evaluating the credibility of the plaintiff's claims regarding her symptoms. *Craig v. Chater*, 76 F.3$^d$ 585, 594 (4th Cir. 2001). He first determined that the plaintiff suffers a medical impairment that could be reasonably expected to produce the plaintiff's pain and other subjective complaints. (R.27-29). Then, in accordance with the second part of the analysis, he evaluated the plaintiff's statements about the intensity and persistence of her subjective symptoms and their functional consequences. In doing so the ALJ appropriately took into account "all symptoms and the extent to which [they could] reasonably be accepted as consistent with the objective medical evidence and other evidence based [on the applicable agency regulations and rulings, including some of the plaintiff's inconsistent statements (R.28,517), incomplete medication compliance (T.28,519,799), the

20

generally successful nature of her treatment (R.28 . (R.27). *See Craig*, 76 F.3d at 595; *see also* 20 C.F.R. §§ 404.1529 and 416.929.

Nevertheless, the plaintiff argues that "objective evidence" documenting her pain-causing fibromyalgia constitutes substantial and compelling evidence of an impairment that would be expected to produce the subjective symptomology (significantly limited daily activities, intense pain and tiredness "all of the time, and "good reasons" for not taking all of her prescribed treatments and medications) about which she testified. (No. 11, pp. 18-21). The ALJ, however, is not required to accept a claimant's testimony about her symptoms at face value; rather he is to weigh such testimony along with all of the evidence, including not the objective medical evidence, but statements and other information provided by physicians or psychologists and other persons about her symptoms and how they affect her and any other relevant evidence in the case record. *See* SSR 96-7p.

The ALJ having, considered the entire record and applied the correct legal standard in his assessment of the plaintiff's credibility, the plaintiff's contention to the contrary is without merit and should be rejected.

21

**E.**

Lastly, contrary to the plaintiff's argument that the ALJ erroneously "relied on an outdated" functional capacity assessment by a "lay adjudicator"[12]is also without merit. In her assertion of this error she argues that at the hearing the ALJ asked the vocational witness to consider certain restrictions noted in Exhibit 15E (R.286-300) and that this resulted in his "misplaced reliance" on the non-medical opinion of a lay state agency employee. (No. 11, pp. 22-23). The record, however, fails to support this assertion. The ALJ in his decision relied only on the residual physical functional capacity assessment affirmed by Dr. Amos, a long-time state agency medical reviewer. *See e.g., Constable v. Astrue*, 179 Soc. Sec. Rep. Service 174 (WDVa. 2012); *Ladd v. Barnhart*, 2005 U.S. Dist. LEXIS 14036 (WDVa. 2005). The exhibit not only bears the electronic signature of Dr. Amos, but it includes his attestation that the record had been thoroughly reviewed to ensure that the evidence was consistent with proposed determination. (R.300). In addition, the exhibit and the vocational testimony are decisionally consistent with Dr. Luc Vinh's earlier (January 2009) physical residual functional capacity assessment (R.434-439).[13] Moreover, the ALJ has wide latitude to pose hypothetical questions of his own device and is free

---

[12] A disability adjudicator/examiner (sometimes called a "single decision maker" or "SDM") performed a physical residual functional capacity assessment for the state agency April 15, 2009, and on the same date it was reviewed and certified as correct by Dr. William Amos. (R.285,300)

[13]The opinions of non-examining state agency medical sources must be considered by the ALJ, insofar as they are supported by evidence in the case record, as those of highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Social Security Act. 20 C.F.R. §§ 404.1527(f) 416.927{f}; SSR 96-6p. The opinion of a non-examining physician can constitute substantial evidence in support of the ALJ's decision when it is consistent with the record. *Smith v. Schweiker*, 795 F.2d343, 345-346 (4th Cir. 1986); *Gordon v. Schweiker*, 725 F.2d231, 235 (4th Cir. 1984).

22

to accept or reject restrictions suggested by a claimant, as long as there is substantial evidence to support the ultimate question. *Hammond v. Apfel*, 5 Fed. Appx. 101, 104 (4th Cir. 2001)

Accordingly, the plaintiff's claim that the ALJ erred by basing vocational testimony of a functional capacity assessment of a non-medical state agency employee is not supported by the evidence. It is contrary to substantial evidence in the record, and it is without merit.

## V.    Proposed Findings

As supplemented by the above summary and analysis and on the basis of a careful and thorough examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.    The Commissioner's final decision is rational and in all material respects is supported by substantial evidence;

2     The ALJ correctly gave no decisional consideration to treating source statements to the effect that the plaintiff was disabled for purposes of employment or was unable to work on a regular basis, because such statements are conclusory and speak to the ultimate issue of disability, which is reserved to the Commissioner;

3.    The ALJ's determination to give "minimal" decisional weight to the treating source opinions of Drs. El-Bogdadi and Hoffman is supported by substantial evidence;

4.    The ALJ's determination that the plaintiff had no condition or combination of conditions that met or medically equaled a listed impairment is supported by substantial evidence;

5.    The plaintiff's residual functional capacity was appropriately assessed by the ALJ;

23

6.  The plaintiff's claim that the ALJ failed to make that assessment in accordance with SSR 96-8p is without merit;

7.  The ALJ applied the correct legal standards in determining his assessment of the plaintiff's credibility, and his assessment is supported by substantial evidence;

8.  The ALJ's functional capacity assessment was properly based on opinions of state agency medical consultants;

9.  The Commissioner met his burden of proving that through the date of the ALJ's decision the plaintiff possessed the residual functional ability to perform work which existed in significant numbers in the national economy;

10. The plaintiff has not met his burden of proving a disabling condition through the date of the ALJ's decision; and

11. All facets of the Commissioner's final decision should be affirmed.

## VI.  Recommended Disposition

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## VII.  Notice to the Parties

Both sides are reminded that pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the

24

period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: This 15th day of August 2012.

s/*James G. Welsh*
United States Magistrate Judge

25